**ADENA EXPLORATION, INC.,**
**Plaintiff–Appellant,**

v.

**Dave SYLVAN, an Individual and as**
**Trustee of the Dave R. Sylvan**
**Revocable Trust, Defendant–Appellee.**

No. 87–1429.

United States Court of Appeals,
Fifth Circuit.

Nov. 16, 1988.

Roger F. Claxton, John T. Mitchell, Kilgore & Kilgore, Dallas, Tex., for plaintiff-appellant.

D.L. Case, Retta A. Miller, Jackson, Walker, Winstead, Cantwell & Miller, Dallas, Tex., for defendant-appellee.

Rosalind C. Cohen, Eva Marie Carney, Washington, D.C., for amicus curiae S.E.C.

Before GARZA, HIGGINBOTHAM, and SMITH, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Plaintiff Adena Exploration, Inc., an oil company, appeals from a judgment and order of rescission in favor of defendant Dave Sylvan, urging that the district court erred in concluding that Adena's sale to Sylvan of an undivided fractional interest in oil and gas was a sale of a security under the federal securities laws. We affirm.

## I

Adena mailed to prospective purchasers approximately twenty-five brochures, describing an opportunity to participate in exploration and drilling for oil and gas in Nacogdoches County, Texas. Sylvan received a copy of the brochure from another prospective investor, Penn Resources, and after his experts analyzed the data gathered by Penn, Sylvan decided to purchase a 25% interest. Penn purchased another 25% interest, and Adena retained a 50% interest. Sylvan executed a Participation Agreement subject to several modifications, which were accepted by Adena.

After one well-completion attempt, Sylvan and Penn met with Adena to discuss further plans. After this meeting, Sylvan met with Penn to discuss the fact that the leases covering 800 acres were subject to Pugh clauses [1] and that they suspected that Adena had been charging off certain overhead costs against the lease costs, thus effecting a "mark up." Penn and Sylvan each requested a credit of $12,250, and Sylvan later notified Adena that he was exercising his right to rescind.

Adena brought suit in Texas state court seeking approximately $200,000 from Sylvan under the Participation Agreement. Sylvan, an Oklahoma resident, removed the case to federal court on the basis of diversity,[2] and asserted as a defense that the agreement violated the Texas statute of frauds and federal securities laws. Sylvan sought rescission on the ground that Adena had failed to disclose material terms, including the fact that certain leases contained Pugh clauses and had certain lease expiration dates, omissions said to violate the anti-fraud provisions of the Securities Act of 1933.[3]

The district court rejected Sylvan's defense under the Texas statute of frauds but found that the transaction involved a "security" and that Adena had made material misrepresentations with respect to lease expiration dates, the existence of Pugh clauses, and overhead charged to the

---

**1.** A Pugh clause provides that where any part of the acreage covered under a lease is pooled or unitized, production on the pooled portion of the lease will not hold the unpooled portion of the lease, thus requiring that delay rentals be paid on the unpooled portion to keep that portion from expiring. *See* W. Summers, *The Law of Oil and Gas* § 1127 (1966).

**2.** Adena is a Texas corporation.

**3.** Section 12(2), 15 U.S.C. § 77*l*(2).

venture. The court denied Adena recovery and granted Sylvan rescission on the ground that Adena had violated the federal securities laws.

Adena appeals from the district court's order of rescission. It does not challenge the district court's finding that it had made material misrepresentations but argues that the interest conveyed to Sylvan was not a security and thus that the federal securities laws are not applicable. Thus, the sole question before us is whether Sylvan's interest in Adena's oil and gas leases is a "security" as defined under the 1933 Act.[4]

## II

There is of course nothing novel about the suit now before us. Sophisticated purchasers of fractional undivided interests in oil and gas have sought—and obtained—rescission of their purchases pursuant to the 1933 Act for at least thirty years. *See, e.g., Woodward v. Wright,* 266 F.2d 108 (10th Cir.1959) (holding rescission remedy available to sophisticated, private purchasers of fractional undivided interest in oil and gas). The Securities and Exchange Commission has consistently espoused the view that any fractional undivided interest in oil and gas is subject to regulation under both the 1933 and 1934 Acts, and adheres to that position in an *amicus* brief filed in this case. S.E.C. Br. at 6–10; Securities Act Release No. 185 (June 20, 1934), 11 Fed.Reg. 10951. Commentators have long argued that the sale of a fractional undivided interest in oil and gas is the sale of a security. *See* Bloomenthal, *SEC Aspects of Oil and Gas Financing,* 7 Wyo.L.J. 49, 53 (1953) ("the sale of fractional undivided interests in the mineral rights, in the landowner's royalty, in an overriding royalty, or in a lease all involve the sale of [a] security").

In light of this history, it would be most surprising if the security status of a fractional undivided interest in oil and gas remained an open question in this Circuit. And, indeed, the issue might fairly be thought settled by this Court's declaration in 1961: "That an assignment of a fractional undivided interest in oil and gas rights is a security within the definition of Section 2(1) of the Act is clearly and uncontrovertably established by decisions of the Supreme Court of the United States...." *Moses v. Michael,* 292 F.2d 614, 618 (5th Cir.1961). *Accord, Nor–Tex Agencies, Inc. v. Jones,* 482 F.2d 1093, 1098 (5th Cir.1973), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1563, 39 L.Ed.2d 873 (1974) (following *Moses*). *See also Roe v. United States,* 287 F.2d 435, 437 and 439 (5th Cir.1961) (distinguishing "fractional undivided interests in oil and gas" from "investment contracts," and citing, with approval, Judge Murrah's opinion in *Woodward,* 266 F.2d 108).

In total, at least five circuits and the Supreme Court have accepted or suggested, by express statement or by apparent implication, that a fractional undivided interest in oil and gas is a security. *See Pinter v. Dahl,* —— U.S. ——, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988) (applying securities laws to fractional undivided interests in oil and gas without commenting on the security status of such interests); *Penturelli v. Spector, Cohen, Gadon & Rosen,* 779 F.2d 160 (3d Cir.1985) (fractional undivided interests held to be securities); *Moses v. Michael,* 292 F.2d 614 (5th Cir.1961); *Whittaker v. Wall,* 226 F.2d 868 (8th Cir. 1955) (upholding suit for rescission of sales of fractional undivided interests in oil and gas); *Simon Oil Co., Ltd. v. Norman,* 789 F.2d 780, 781 (9th Cir.1986) (commenting, with approval, upon the Third Circuit's "well-reasoned" opinion in *Penturelli,* although remanding for application of the "risk capital" approach); *Woodward v. Wright,* 266 F.2d 108 (10th Cir.1959). We

---

4. Of course, "[t]he term security has the same meaning for purposes of both the 1933 Securities Act and the 1934 Securities Exchange Act." *Youmans v. Simon,* 791 F.2d 341, 344 (5th Cir. 1986); *see also Landreth Timber Co. v. Landreth,* 471 U.S. 681, 105 S.Ct. 2297, 2301 n. 1, 85 L.Ed.2d 692 (1985) ("[T]he definitions of 'securi-ty' in [both Acts] are virtually identical and will be treated as such in our decisions dealing with the scope of the term"). Thus, our analysis is not restricted to the 1933 Act. This action, however, was brought pursuant to the 1933 Act only; our references to that act have factual rather than legal significance.

have not found any circuit court decision denying security status to an instrument properly denominated a fractional undivided interest in oil and gas.

■ Appellants nonetheless assert that the sale of a newly [5] fractionalized undivided interest in oil and gas is sometimes not a security within the meaning of the Act. We have neither the authority nor the inclination to call into question the clearly articulated rule of this Court's earlier decisions in *Moses* and *Nor–Tex.* On the other hand, we are sensitive to the commercial significance of securities regulation, and are cognizant that this area of law is growing increasingly complex. We therefore examine now the security status of fractional undivided interests under the Securities and Exchange Acts in light of the major decisions construing those Acts. In so doing we reaffirm our pronouncements in *Moses* and *Nor–Tex.*

We begin with the statute itself. In determining whether Sylvan's interest in Adena's oil and gas leases is a "security," we look to the definition provided in § 2(1) of the 1933 Act, which says that "unless the context otherwise requires," the term "security" means

any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, *fractional undivided interest in oil, gas, or other mineral rights,* or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.[6]

By this express language, the definition of "security" includes Sylvan's interest as a "fractional undivided interest in oil, gas, or other mineral rights."

Ordinarily, we do not look beyond the plain language of a statute; at the same time, however, we do not garrote congressional purpose with zealous literalism. Adena argues that a literalist approach is incompatible with Supreme Court case law and that we must inquire further than the express language of the statute. The Supreme Court, in *S.E.C. v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943), spoke to the import of the statutory reference to "fractional undivided interests in oil and gas." The Court's comment upon the phrase guides our construction of the statute's meaning. The Court, speaking through Justice Jackson, said

Oil and gas rights posed a difficult problem to the legislative draftsmen. Such rights were notorious subjects of speculation and fraud, but leases and assignments were also indispensable instruments of legitimate oil exploration and production. To include leases and assignments by name might easily burden the oil industry by controls that were designed only for the traffic in securities. This was avoided by including specifically only that form of splitting up of mineral interest which had been most utilized for speculative purposes. We do not think the draftsmen thereby immunized other forms of contracts and offers which are proved as matter of fact to answer such terms as "investment contracts" and "securities."

320 U.S. at 352, 64 S.Ct. at 124. Congress, in other words, did not leave judges the difficult task of balancing the need for regulation against the burdens to the oil industry. Rather, Congress singled out "fractional undivided interests in oil and gas" as a form of oil and gas rights subject to securities regulation. The clear implication of the *Joiner* Court's analysis is that

---

**5.** Where the owner of a fractional undivided working interest surrenders his entire interest whole, there is no sale of a "fractional undivided interest" under the Act. *Roe* 287 F.2d at 437. There may, however, be a sale of an "investment contract" in such situations. *Lynn v. Caraway,* 379 F.2d 943, 944–45 (5th Cir.1967), *cert. denied,* 393 U.S. 951, 89 S.Ct. 373, 21 L.Ed.2d 362 (1968).

**6.** 15 U.S.C. § 77b(1) (emphasis added).

while the Act's coverage of the oil and gas industry may extend beyond fractional undivided interests in oil and gas, it extends at the very least to the sale of any such interest.

What *Joiner* left to implication Judge Murrah made explicit in his influential opinion in *Woodward v. Wright*, 266 F.2d 108 (10th Cir.1959), a landmark securities case which remains frequently cited today. *See, e.g., San Francisco–Oklahoma Petroleum Exploration Corp. v. Carstan Oil Company, Inc.*, 765 F.2d 962, 966 (10th Cir.1985). *Woodward* is closely parallel to the dispute between Adena and Sylvan: it, like the present case, involved a claim for rescission brought by highly sophisticated purchasers of fractional undivided interests in oil and gas. It is difficult to improve upon Judge Murrah's reasoning, and we therefore describe it in detail. Judge Murrah began by observing that "a fractional undivided interest in oil and gas becomes a 'security' when it is created out of the ownership of an interest in oil and gas, and this is so even though what he sold was a fractional interest therein or other mineral rights for the purpose of sale or offering for sale." He added that "[t]he legislative policy however is to bring all 'securities' within the regulatory scope of the Act without regard to form or legal terminology, and so we look to the facts to determine whether in reality that which was sold in this transaction can be said to be either an investment contract or the creation of fractional interests in oil and gas." *Id.* at 112–13.

Judge Murrah summarized his conclusions as follows:

> The contract provided for the sale of an entire oil and gas lease. But it clearly contemplated the creation of fractional interests therein and conveyance of the same to the respective purchaser-contractees. That which was ultimately conveyed under the terms of the contract was, to be sure, fractional undivided interests in oil and gas. They were created for the purpose of sale. And, they were therefore securities within the meaning of the Act.

*Id.* at 114. Judge Murrah's test is simple: if a fractional undivided interest is created for the purpose of sale, the conveyance of the interest is the sale of the security. There can be no doubt that, under this test, the interests created by Adena for sale to Penn and Sylvan are securities.

Judge Murrah's analysis did not conclude with this definition, but continued on to consider the availability of a rescission remedy pursuant to 15 U.S.C. § 77*l* (2), which is now referred to as Section 12(2) of the 1933 Act. He recognized that because the offering was not subject to the registration requirements, 15 U.S.C. § 77*l* (1) was inapplicable. Judge Murrah held, however, that the Section 12(2) remedy remained available despite the limited character of the offering, the sophistication of the purchasers, and the face-to-face negotiations between the purchasers and sellers:

> The contract was entered into after on-the-ground inspection and negotiation.... The whole transaction was a closely knit arrangement among friends and *acquaintances*, and was conducted on a personal basis.... All of the purchasers apparently entered into the transaction with sophisticated discernment. Viewed in the whole context of the Act, we see no practical need for the application of absolute liability provisions of [15 U.S.C. § 77*l* (1) ] to isolated transactions of this kind. But, as we have seen, the [15 U.S.C. § 77*l* (2) ] remedy is applicable to the sale of all securities (with exceptions not here material) whether exempt from the registration requirements or not, or whether the sellers were issuers for the purpose of public offering or not.

266 F.2d at 115–16 (emphasis in the original). Judge Murrah's argument forecloses Adena's appeal.

Adena does not offer any argument distinguishing *Woodward* from the instant case, nor does Adena point out any flaws in Judge Murrah's reasoning. Adena contends, however, that we are bound by *S.E. C. v. W.J. Howey Co.*[7] to determine whether the "economic reality" of this transac-

7. 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946).

tion indicates that Sylvan's interest was a "security."

In *Howey*, the SEC sought to apply the securities laws to the sale of units of a citrus grove, which was coupled with a contract for cultivation of the grove with net proceeds from the crop to be remitted to the owner. The court held that such an interest was an "investment contract" within the definition of "security." The oft-cited *"Howey* test" states that "an investment contract for purposes of the Securities Act [is] a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of a promoter or a third party...."[8] Adena contends that even though Sylvan does not characterize his interest as an investment contract, every "security" must satisfy the *Howey* test.[9]

*Howey*, of course, in no way detracts from the force of Judge Murrah's reasoning in *Woodward*, which was decided well after both *Howey* and *Joiner*. Judge Murrah invoked the *Howey* test to decide that the lease assignments at issue in *Woodward* were not "investment contracts," but then went on to consider the separate question of whether the lease assignments involved the conveyance of fractional undivided interests in oil and gas. 266 F.2d at 114.

Judge Murrah's refusal to apply *Howey* to the sale of *every* "security" becomes all the more convincing after the Supreme Court's decision in *Landreth Timber Co. v. Landreth*.[10] In *Landreth*, the purchasers of the stock of a timber company sued their sellers, alleging fraud in violation of the 1933 Act. The Supreme Court rejected the "sale of business" doctrine,[11] under which some circuits had held that sale of 100 percent of a closed corporation's stock was not a "security."[12] On one level, this doctrine was a logical extension of the *Howey* test, insofar as the purchaser of all the stock in a closed corporation often does not expect to profit solely from the efforts of a third party.[13] However, the Supreme Court declined to apply *Howey*, reasoning that "the *Howey* economic reality test was designed to determine whether a particular instrument is an 'investment contract,' not whether it fits within *any* of the examples listed in the statutory definition of 'security.' "[14]

The *Howey* test arose out of cases that "involved unusual instruments not easily characterized as 'securities.' ... Thus, if the Act were to apply in those cases at all, it would have to have been because the economic reality underlying the transactions indicated that the instruments were actually of a type that falls within the usual concept of a security."[15] In the *Landreth* Court's view, to apply the *Howey* test to every type of instrument listed in the statutory definition would render the enumeration superfluous.[16] The same difficulty would result if we applied *Howey* to Sylvan's interest, insofar as the interest falls squarely within the term "fractional undivided interest in oil, gas or other mineral rights." The statutory definition of a security includes both relatively specific categories, composed of "instruments whose names alone carry well-settled meaning," and "more variable" categories, composed of instruments referenced by "descriptive terms."[17]

As the Third Circuit recently recognized, *Landreth*'s limitation on *Howey* renders

---

8. *Id.* at 298–99, 66 S.Ct. at 1102–03.

9. *Cf. International Brotherhood of Teamsters v. Daniel,* 439 U.S. 551, 558 n. 11, 99 S.Ct. 790, 795–96 n. 11, 58 L.Ed.2d 808 (1979) (stating that the *Howey* test " 'embodies the essential attributes that run through all of the Court's decisions defining a security' ").

10. 471 U.S. 681, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985).

11. *Id.* at 2306–07.

12. *See, e.g., King v. Winkler,* 673 F.2d 342, 345 (11th Cir.1982).

13. *See id.* at 346.

14. *Id.* at 2304 (emphasis in original).

15. *Id.*

16. *Id.* at 2305.

17. *Id.* at 2301–02.

*Howey* inapplicable to mineral interests. In *Penturelli v. Spector, Cohen, Gadon & Rosen,*[18] that court reversed a district court holding that a mineral interest did not qualify as a "security" under the *Howey* test. The appellate court instead held that the *Howey* test was inapplicable, rejecting the argument that *Landreth* should be limited only to holdings in stock. The court noted that a "fractional undivided working interest" in a mineral lease arises "when a lessee of mineral rights sells parts of its interest in the rights in order to finance the development of the minerals."[19] The court stressed that the 1933 Act specifically enumerates these fractional interests as securities, stating:

> Congress chose not to include leases and assignments because they were indispensable instruments of legitimate oil exploration and production and it wanted to avoid burdening the oil industry by controls that were designed only for traffic in securities. On the other hand, Congress did specifically mention in the Acts the fractional undivided interest, which was "that form of splitting up mineral interests which had been most utilized for speculative purposes."[20]

The court then observed that other circuits had held that a fractional interest in minerals was a "security" under a variety of tests, that the SEC officially had stated that it regards "interests precisely like those at issue in this case as securities within the statute,"[21] and that the parties themselves considered the interests securities.

The court also noted that *Landreth* had distinguished *S.E.C. v. C.M. Joiner Leasing Corp.*[22] and *United Housing Foundation, Inc. v. Forman.*[23] *Joiner* involved the sale of leasehold interests in land near a proposed oil well drilling rather than a fractional undivided interest, and *Forman* involved the sale of an interest for "personal use" rather than "stock" in the traditional sense, despite the label. The Supreme Court had found the instruments in *Joiner* and *Howey* to be "securities" because they were "investment contracts," but found that *Forman* did not involve securities even though the instruments sold bore the name "stock." The Third Circuit, following *Landreth*, reasoned that *Joiner, Howey*, and *Forman* did not mean that, faced with an instrument falling squarely within another statutory definition, courts must also apply the economic reality inquiry:

> It follows that if any inquiry other than whether the instrument fits the statutory definition is appropriate, it would be whether the instrument and transaction fit the traditional characteristics of the defined term, or whether ... the reasons and policies that gave rise to protection of securities under the 1933 and 1934 Acts are applicable.[24]

The court then concluded that the transaction there fit within the traditional characteristics of an "undivided mineral interest." The court specifically rejected defendant's argument that a "passive investor test or a management or control inquiry" should be applied, holding that such an inquiry is not applicable to determine whether stock is a security under *Landreth*, and that there is "no reason why that would not also be true of the fractional undivided interest, also enumerated in the statutory definition."[25] The court thus ruled that, as a matter of law, the interest was a security governed

---

**18.** 779 F.2d 160 (3d Cir.1985).

**19.** *Id.* at 165 (citing L. Loss, *Fundamentals of Securities Regulation* 184 (1983)).

**20.** *Id.* (citations omitted). Professor Loss points out that "Section 2(1) was amended in 1934 to make clear that it covers any 'fractional undivided interest in oil, gas, or other mineral rights.'" L. Loss, *Securities Regulation* 471 (1961) (Student Edition) (citing H.R.Rep. 1830, 73d Cong., 2d Sess. (1934) 39).

**21.** *Penturelli,* 779 F.2d at 166 (citing Exchange Act Release No. 14273 [1977–78 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 81,387 (December 15, 1977)).

**22.** 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943).

**23.** 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975).

**24.** *Penturelli,* 779 F.2d at 167 (citations omitted).

**25.** *Id.*

by the anti-fraud provisions of the federal securities acts.

■ We are persuaded by the Third Circuit's analysis.[26] Under the *Landreth* inquiry, we must look to whether an instrument or transaction is covered by the plain language of the definition—whether it "lends itself to consistent definition"[27] and is "provable by its characteristics."[28] Here, the specific interest sold by Adena to Sylvan cannot be distinguished from the interest sold in *Penturelli*. Nor can the interest be distinguished from that which Judge Murrah characterized as a security in *Woodward*, well after *Howey* but long before *Landreth*. Like the Tenth and Third Circuits, we are persuaded that this interest falls squarely within the definition of § 2(1). Sylvan purchased a twenty-five percent working interest and executed a Participation Agreement under which Adena was listed as operator and the Sylvan Trust was listed as Non–Operator. The Agreement transfers to Sylvan "an undivided 25% interest in and to" certain leases in Nacogdoches County, Texas. Under the common use of the terms throughout the industry, in Supreme Court cases,[29] and in oil and gas treatises, this can be nothing but "a fractional undivided interest" in oil and gas. As the Second Circuit has noted, "The more recent teaching of the Supreme Court suggests that the economic realities test should be used only when the interest in question does 'not fit squarely within one of the enumerated kinds of securities listed in the [Act's] definition' of a security."[30] We are persuaded that Sylvan's interest does fit "squarely within" the definition of § 2(1) and hold that the economic reality test of *Howey* is inapplicable.[31]

Yet, we must be ever mindful that the statutory definition of "security," is accompanied by that vexatious phrase, "unless the context otherwise requires."[32] Thus, even though we are not bound to apply the *Howey* test here, we might still be required to examine the factual "context" of the transaction to determine whether Sylvan's interest is properly considered a security. In *Marine Bank v. Weaver*,[33] the Supreme Court looked to the regulatory context of certificates of deposit in deciding that such certificates are not securities. The Court reasoned that the certificate of deposit was not like a typical long-term debt obligation subject to the securities laws because the certificate "was issued by a federally regulated bank which is subject to the comprehensive set of regulations governing the

**26.** We are not alone in our conclusion. Two other courts have addressed *Penturelli*. In *Simon Oil Co., Ltd. v. Norman*, 789 F.2d 780, 781 (9th Cir.1986), the court noted that "the Third Circuit in a well-reasoned opinion has extended [the *Landreth* ] reasoning to encompass undivided interests in mineral rights." However, though commenting favorably on the Third Circuit analysis, the Ninth Circuit did not resolve the issue but reversed dismissal of a complaint on the ground that there was a triable issue of fact as to whether the transactions there involved met that circuit's "risk capital test." *See id.* at 783. In *Simon v. Fribourg*, 650 F.Supp. 319, 321 (D.Minn.1986), the court noted that the Third Circuit cautiously had extended *Landreth* to fractional mineral interests because the interest there "differed in no way from the common definition found in Supreme Court decisions and Professor Loss's work," but the Minnesota court declined to extend *Landreth* to the situation before it, certificates of interest in profit-sharing agreements; the court found that unlike the terms at issue in *Penturelli*, "there is little authority to suggest that a 'certificate of interest or participation in a profit-sharing agreement' is a term so commonly understood and an agreement so easy to identify that it should be 'proveable by [its] name and characteristics.'" *Id.*

**26.** (quoting *Landreth*, 105 S.Ct. at 2306 and the definition of "security" in 15 U.S.C. § 77b(1)).

**27.** *Landreth*, 105 S.Ct. at 2306.

**28.** *Id.*

**29.** *See, e.g., Joiner*, 320 U.S. at 352, 64 S.Ct. at 124.

**30.** *Sulkow v. Crosstown Apparel, Inc.*, 807 F.2d 33, 37 (2d Cir.1986) (quoting *Landreth*, 105 S.Ct. at 2304 n. 4).

**31.** We also note the Supreme Court's recent decision in *Pinter v. Dahl*, —— U.S. ——, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988). In determining whether the in pari delicto defense is available in a private recission action, the Court never questioned whether the underlying instrument—a fractional undivided interest in oil and gas leases—was a security.

**32.** 15 U.S.C. § 77b.

**33.** 455 U.S. 551, 102 S.Ct. 1220, 71 L.Ed.2d 409 (1982).

banking industry." [34]  These statutes and regulations, the Court noted, both guaranteed the funds on deposit and subjected the lender to disclosure requirements. In this context, the Court concluded, the additional protections of the securities laws were unnecessary.[35]

In *Landreth* the Supreme Court did not cite to *Weaver* but used the "context" concept to distinguish the decision in *Forman:* "Moreover, unlike in *Forman*, the context of the transaction involved here—the sale of stock in a corporation—is typical of the kind of *context* to which the Acts normally apply." [36]

Arguably, these statements by the Court could be interpreted to require an inquiry into the factual context of any transaction alleged to involve a security. However, we are convinced that *Weaver* properly is read more narrowly.[37]  In neither *Weaver* nor *Landreth* did the Court inquire into the *factual* context of the transaction before it. In *Weaver*, particularly, the Court's concern is better characterized as testing the legislative and regulatory "context" of the transaction, the question being whether in light of other federal protections affecting the transaction, Congress would have intended the securities laws to apply. With respect to Sylvan's interest, we are given

no indication that the legislative and regulatory context would render securities laws protections duplicative. Hence, we find no inconsistency between our result and *Weaver.*

Moreover, *Weaver* was not a case in which the interest alleged to be a security fell squarely within a type of instrument enumerated in the statutory definition.[38]  Rather, the question before the Court was whether the certificate of deposit fell into the statute's "catch-all" provision; i.e., whether the instrument was one "commonly known as a 'security.'" [39]  The Court did not limit its analysis to this part of the statutory definition, but insofar as context is a question of congressional intent, the specific enumeration of a particular type of instrument as a "security" makes it less likely that Congress meant for other regulatory legislation affecting that instrument to displace the protections of the securities acts.

Our holding that Sylvan's interest was a security is consistent with the policies manifested in other decisions construing the Act's definition of a security. We do not assume that investors are always passive. Indeed, many investors are sophisticated and able to fend for themselves, and it can

---

**34.** *Id.* at 558, 102 S.Ct. at 1224 (footnote omitted).

**35.** *Id.* at 557–59, 102 S.Ct. at 1224–25; *see also Daniel,* 439 U.S. at 569–70, 99 S.Ct. at 801–02 (noting that the existence of ERISA protections made it less likely that Congress intended the securities laws to apply to "non-contributory, compulsory pension plans"); *Weaver,* 455 U.S. at 558 n. 7, 102 S.Ct. at 1224 n. 7 (discussing *Daniel* ).

**36.** *Landreth,* 105 S.Ct. at 2302 (emphasis added). This use of the "context" clause would justify exempting an instrument from the coverage of the Securities Act if the instrument, although denominated a "fractional undivided interest" in oil or gas, lacked the characteristics typically associated with such an interest. An example of such an instrument is found in *Davis v. Rio Rancho Estates, Inc.,* 401 F.Supp. 1045, 1050–51 (S.D.N.Y.1975), where the court considered a contract which, literally read, guaranteed the purchaser a fractional share in the proceeds from later development of mineral rights retained by the seller. The court held that the contract was nonetheless an installment sale of

real property rather than a speculative investment. Like the "stock" in *Forman*, the "fractional undivided interest" in *Davis* was not an investment device at all, and thus was not a security within the meaning of the Act.

**37.** *See generally* Marc I. Steinberg & William E. Kaulbach, *The Supreme Court and the Definition of "Security": The "Context" Clause, "Investment Contract" Analysis, and Their Ramifications,* 40 Vand.L.Rev. 489, 504–12 (1987) (analyzing *Weaver*'s treatment of the "context" clause).

**38.** The Court explained that the term "certificate of deposit" that appears in the enumeration does not encompass the instruments now commonly sold by banks under that name. *See Weaver,* 455 U.S. at 557 n. 5, 102 S.Ct. at 1224 n. 5.

**39.** *See* 15 U.S.C. § 78c(a)(10); *compare Weaver,* 455 U.S. at 557, 102 S.Ct. at 1224 (phrasing the issue as whether the certificate of deposit is like "any other long-term debt obligation commonly found to be a security").

be argued that sales of fractional undivided mineral interests to sophisticated purchasers should not involve the sale of a security. We, like Judge Murrah before us, are unpersuaded. In the context of sales by a lessee, as distinguished from sales of royalty by lessor-owners,[40] where raising of capital and risk distribution are daily fare, the purposes of the securities law are served poorly by a rule that hinders the parties' ability to determine whether a security is being sold until after the transaction. Adhering to the statute's plain language does no violence to the disclosure purposes of the securities acts; even where sophisticated investors are involved, clarity and predictability of rules are particularly prized in commercial transactions. As the Supreme Court has noted, "the parties' inability to determine at the time of the transaction whether the Acts apply neither serves the Acts' protective purpose nor permits the purchaser to compensate for the added risk of no protection when negotiating the transaction." [41] *See also Nor–Tex,* 482 F.2d at 1099 ("sophisticated investors, like all others, are entitled to the truth").

Moreover, the immediate consequence of selling a security is only to trigger the anti-fraud provisions of the act; to trigger the registration provisions, the interest must be marketed in ways that make the seller an "issuer." [42] Of course, the secondary consequence of treating a transaction as involving a sale of a security is to give a plaintiff access to a federal court; however, parties are free to negotiate for arbitration,[43] and private ordering is likely to be enhanced by a rule sufficiently predictable in its reach to allow the parties to adjust their affairs.

Nor need we be troubled by those decisions looking to "economic reality" to determine whether a particular instrument has security status because it is a "note." Congress made clear in the statutory text that not all notes are securities. Section 3(a)(3) of the Securities Act exempts from the Act's registration requirements any "note ... which arises out of a current transaction, or the proceeds of which ... are to be used for current transactions, and which has a maturity at the time of is-

---

**40.** Professor Loss has described these distinct interests:

> In the typical case the development of an area with an oil potential is dependent upon a favorable geologist's report, although the established companies are apt to get large amounts of acreage under option even before doing any geological or geophysical work. If the report is favorable, the process of leasing or "blocking" the tract begins. Representatives of one or more producers or speculators obtain leases to the oil and gas rights on as many of the individual tracts as they can. The tracts are typically "granted, demised, leased and let" to the lessee "for the sole and only purpose of mining and operating oil and gas and laying pipelines" during a stated term of years. The lessor receives, in addition to an immediate "cash bonus" in some cases, a promise on the part of the lessee to pay a stated rental per acre for every year in which a well is not drilled, and a further promise of a stated percentage, usually one-eighth, of the oil and gas actually produced and sold or its value at the prevailing market price.
>
> This one-eighth interest is the "landowner's royalty interest," and it commonly finds its way into the securities markets in lots of fractional undivided portions after having been transferred to banks as collateral for loans or having been sold to an oil royalty dealer. The *lessee's* interest is termed the

> "working interest." If the lessee is an establishd [sic] producing company, it may retain all of the working interest. On the other hand, if it does not have independent resources, it may sell fractional undivided shares of the lease to raise working capital, or it may give a part interest in the lease to a drilling contractor, who in turn may sell all or part of his share to finance the drilling.

Loss, *Securities Regulation* at 469. It is this latter sort of interest—a fraction of a "working interest"—which Sylvan purchased from Adena.

**41.** *Gould v. Ruefenacht,* 471 U.S. 701, 105 S.Ct. 2308, 2311, 85 L.Ed.2d 708 (1985).

**42.** *See Woodward v. Wright,* 266 F.2d 108, 114 (10th Cir.1959); S.E.C., *Compilation of Rules, Regulations, Forms and Opinions Applicable to Oil and Gas Interests,* CCH Fed.Sec.L.Rep. ¶ 2131.15 (July 1, 1935).

**43.** *See generally Rodriguez De Quijas v. Shearson/Lehman Bros., Inc.,* 845 F.2d 1296 (5th Cir. 1988), *cert. granted,* (Nov. 14, 1988) (holding that claims under § 12(2) or Securities Act of 1933 are subject to predispute arbitration agreements). We recognize that neither the Supreme Court nor this Circuit has yet explicitly decided that arbitration is available in wholly private securities transactions outside any superintendence of the SEC.

suance of not exceeding nine months...." 15 U.S.C. § 77c. There is a comparable proviso in the 1934 Exchange Act's general definition of a security. 15 U.S.C. § 78c(a)(10). These textual restrictions upon the security status of notes responded to an observation which the Federal Reserve Board addressed to the draftsmen of the 1933 Act. The Board argued that notes ought to be covered by the Act only insofar as they were designed for "investment" rather than to provide "funds for current transactions." Note, *The Commercial Paper Market and the Securities Acts*, 39 U.Chi.L.Rev. 362, 382 (1972). Many if not all of the cases evaluating the security status of notes have focused upon the concern, first articulated by the Reserve Board, that only commercial paper having some investment aspect ought to be regulated by the Securities and Exchange Acts. This Circuit's own cases are among those which stress the distinction between investment notes and commercial notes. *See, e.g., Woodward v. Metro Bank*, 522 F.2d 84, 91–92 (5th Cir.1975); *McClure v. First Nat'l Bank of Lubbock*, 497 F.2d 490 (5th Cir.1974); *SEC v. Continental Commodities Corp.*, 497 F.2d 516, 524–25 (5th Cir. 1974). *See also* Sonnenschein, *Federal Securities Law Coverage of Note Transactions: The Antifraud Provisions*, 35 Bus. Law. 1567, 1589–1601 (1980). The distinction between investment notes and non-investment notes has a parallel in the Supreme Court's cases construing the security status of stock. While the Court has refused to make the security status of stock hinge upon a distinction between active and passive investors,[44] the Court has made that status dependent upon whether the stock serves an investment purpose.[45]

Judge Henry Friendly, one of the leading interpreters of the federal securities laws, has criticized the Fifth Circuit's approach to defining the security status of notes as failing "to pay ... heed to the statutory language." Judge Friendly, while recognizing the textual basis for the distinction among kinds of notes, chided this Circuit for its inattention to the details of the statute, which distinguishes among notes on the basis of their maturation dates. *Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 936–37 & n. 12 (2d Cir. 1984). We need not now address whether or not this Circuit should reconsider its treatment of notes in light of the Supreme Court's adoption in *Landreth* of a textualist approach, comparable to Friendly's *Chemical Bank* approach, to defining a security.[46] But, with *Landreth* in place, we cannot extend the jurisprudence of our notes cases to the distinct category of fractional undivided interests in oil and gas, where we lack any textual or historical warrant to narrow the statutory category.

Likewise, the cases applying an "economic reality" test to define the security status of "investment contracts" rest upon considerations special to that category. Congress invoked the term "investment contract" against a background of state law precedents which had construed the term by recourse to the touchstone of economic reality. *S.E.C. v. Howey Co.*, 328 U.S. 293, 298–99, 66 S.Ct. 1100, 1102–03, 90 L.Ed. 1244 (1946). The category is akin to the statutory definition's concluding reference to "any interest or instrument commonly known as a security,"[47] and serves as a residual category capable of encompassing unusual instruments that do not fit more conventional forms.[48]

### III

To summarize our analysis, we today hold that careful attention to the words of

---

**44.** *Gould v. Ruefenacht*, 105 S.Ct. at 2310–11.

**45.** *Landreth*, 105 S.Ct. at 2302 (distinguishing *Forman*, 421 U.S. 837, 95 S.Ct. at 2053).

**46.** Indeed, Judge Friendly compared this Circuit's treatment of notes to the Seventh Circuit's equally "freewheeling" sale-of-business doctrine. 726 F.2d at 938. The Supreme Court in *Landreth* expressly left open questions about the security status of notes, although the Court did mention that notes might be categorized according to whether they were issued in a "consumer context, as commercial paper, or in some other investment context." *Landreth*, 105 S.Ct. at 2306.

**47.** *See Landreth*, 105 S.Ct. at 2304 & n. 5.

**48.** *Youmans v. Simon*, 791 F.2d 341, 345 (5th Cir.1986).

the Securities Act reveals that if a financial instrument is properly denominated a "fractional interest in oil and gas," then the instrument is necessarily a security. In so holding, we follow, as we must, not only our past decisions in *Moses* and *Nor-Tex*, but also the Supreme Court's decisions in *Joiner* and *Landreth*. As *Landreth* made clear, the basis for our holding is necessarily textual, not functional. The *Landreth* Court determined that stock was always a security within the meaning of the Act *not* because such a rule would be consistent with economic theory, but, on the contrary, because the language of the Act compelled that result *regardless* of whether supported by finance theory.

We would depart from our proper course were we to offer a broad, functionalist definition of a security. Such a theory might have much going for it as a matter of policy science or economic theory. But as legal doctrine, it is flawed by a misreading of the Supreme Court's highly textual definition of a security; the theory's policy implications, whatever they may be, could in no way overcome the problems resulting from the theory's inattention to the statutory text.[49] Although economic theory may in appropriate instances contribute to the development of legal theory, its use here is foreclosed by precedent, statutory text, and Congressional intent.

*Forman* is entirely consistent with this reading of *Landreth*. Stock is identifiable by its characeristics, not its label. Characteristics are no less recognizable in the absence of a theory explaining them, nor are they simply names. One need not, in other words, be a botanist to know that a rose by any other name would smell as sweet. Where the Act refers to a category recognizable by its characteristics, there is no need to define the category by reference to economic theory. Such is the case both with stock and with fractional undivided interests in oil and gas.

That is not to say that the Securities and Exchange Acts regulate arbitrary categories of financial investments. The purpose of the Acts is to ensure that investment transactions take place in the context of "full and fair disclosure," and to preserve "honest markets" founded upon "honest publicity."[50] The Acts thereby safeguard the integrity of a capital market characterized by financial transactions that are complex, rapid, and large. Frequently those transactions involve traditional instruments such as stock or fractional undivided interests in oil and gas, but the transactions may also proceed through more general, less easily named devices which the Act describes in broader terms as "notes" or "investment contracts."

Of course, the various instruments used to effectuate complex financial transactions will often share certain general features. One of these is the familiar division between investment and management. Such a division facilitates complex, rapid transactions, since it is difficult to make a rapid change in financing if that change necessarily entails a change in management. Moreover, the risk of ill-advised or ill-informed decision making diminishes when an investor is personally involved in managing the venture that is the subject of the transaction.

Yet these frequently shared features are not essential elements of a security. The Supreme Court made this point clearly in

---

**49.** During the period between *Forman* and *Landreth*, the Supreme Court's broad language in *Forman* encouraged speculation that the security status of any instrument should be measured solely by reference to economic reality. None of that speculation, moreover, took place in cases involving fractional undivided interests in oil and gas. Since those post-*Forman* decisions, however, both this Circuit and the Supreme Court have rejected the comprehensive "economic analysis" approach, and *Landreth* puts clear textual limits on the pursuit of a functionalist definition. *Compare LTV v. UMIC Government Securities, Inc.,* 523 F.Supp. 819, 828 (N.D. Tex.1981) (Higginbotham, J.) and *Meason v. Bank of Miami,* 652 F.2d 542, 548 (5th Cir.1981) (both discussing economic reality test) *with Daily v. Morgan,* 701 F.2d 496, 499–500 (5th Cir. 1983) (limiting *Howey*).

**50.** *Landreth,* 105 S.Ct. at 2302 (1933 Act); *Basic, Inc. v. Levinson,* —— U.S. ——, 108 S.Ct. 978, 982, 99 L.Ed.2d 194 (1988) (1934 Act).

*Gould v. Ruefenacht,*[51] where the Court held that stock is a security even when purchased pursuant to a contract *requiring* the purchaser to participate in management of the company. The Court in *Ruefenacht* reiterated the textual focus of *Landreth,* but added that a purely economic analysis would frustrate, rather than further, the purposes of the Act. To predicate the definition of a security upon a detailed analysis of corporate control and investment devices would make the applicability of the Securities and Exchange Acts turn upon extended litigation, the peculiar characteristics of purchasers and sellers, and the nature of distinct transactions.[52] By making financial instruments into "juridical chameleons,"[53] which change into securities as the result of minor variations in background, an economic approach would detract from the market certainty, reliability, and stability that the Acts aim to establish by their program of "full and fair disclosure."

We must remember, moreover, that the provisions defining what is a security are not the sole means for effectuating the multivalent policies of the Act. Other statutory clauses recognize the need to exempt issuers from registration requirements in instances when an offering is small and the investors are well-informed.[54] The Supreme Court has also recently ruled that equitable principles may protect a seller of securities from liability in a suit brought by a purchaser who is equally responsible for the unregistered distribution of securities.[55]

By none of this do we mean to deny that economics may in some cases be a useful, if not indispensable, aid to judicial decision making. Where application of a legal standard, or the existence of legal ambiguity, compels judges to formulate legal rules compatible with commercial practices and purposes, recourse to economics is appropriate. *See, e.g., In re LTV Securities Litigation,* 88 F.R.D. 134 (N.D.Tex.1980) (developing fraud-on-the-market theory later endorsed by the Supreme Court in *Basic, Inc. v. Levinson,* — U.S. —, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)); *Lewis v. Timco, Inc.,* 716 F.2d 1425, 1432–33 (5th Cir.1983) (*en banc*) (discussing economic aspects of comparative fault rule). Economics, however, must not be used as a lever by which to force ambiguity into legal rules that would otherwise be clear.

On balance, we are persuaded that our reading of the Securities Act gives meaning to the full statute and the congressional purpose behind it. We decline to succumb to the temptation to write a better statute for Congress. We will not lightly assume that Congress intended to leave to judges the ad hoc creation of policy inherent in any effort to "adjust" the meaning of a sale of a "fractional undivided interest in oil and gas." The judicially created right to enforce Rule 10b–5 is a paradigmatic example of the problems that may follow from judicial policy making in this area.[56]

We AFFIRM.

---

51. 471 U.S. 701, 105 S.Ct. 2308, 85 L.Ed.2d 708 (1985).

52. 105 S.Ct. at 2311.

53. *D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 471–472, 62 S.Ct. 676, 685–6, 86 L.Ed. 956 (1942).

54. *See, e.g.,* 15 U.S.C. § 77b(4) (restricting issuer status, in cases involving fractional undivided interests in oil and gas, to public offerings); Regulation B—Exemption Relating to Fractional Undivided Interests in Oil and Gas, 17 C.F.R.

§ 230.300–346 (1988); Regulation D—Rules Governing the Limited Offer and Sale of Securities Without Registration Under the Securities Act of 1933, 17 C.F.R. § 230.501–.506 (1988).

55. *Pinter v. Dahl,* — U.S. —, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988).

56. *See Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 737, 95 S.Ct. 1917, 1926, 44 L.Ed. 2d 539 (1975) ("when we deal with private actions under Rule 10b–5, we deal with a judicial oak that has grown from little more than a legislative acorn").