*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 12a0090p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

GREGORY M. NOLFI, as Successor Trustee
under the Frederick E. Nonneman Declaration
of Trust Dated August 19,1994, as Amended;
ANITA C. NONNEMAN, as Executrix of the
Estate of Deceased Frederick E. Nonneman;
RENA NONNEMAN,
        *Plaintiffs-Appellees/Cross-Appellants,*

                v.

OHIO KENTUCKY OIL CORPORATION; CAROL
L. CAMPBELL, individually and as Executrix
of the Estate of Deceased William M.
Griffith,
        *Defendants-Appellants/Cross-Appellees.*

> Nos. 09-4315/4316/4323

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 06-00506; 06-00260—John R. Adams, District Judge.

Argued:  March 4, 2011

Decided and Filed:  April 4, 2012

Before:  COLE, GIBBONS, and ROGERS, Circuit Judges.

_____

## COUNSEL

**ARGUED:**  Thomas W. Connors, BLACK, McCUSKEY, SOUERS & ARBAUGH,
Canton, Ohio, for Appellants.  Dennis R. Rose, HAHN, LOESER & PARKS LLP,
Cleveland, Ohio, for Appellees.  **ON BRIEF:**  Thomas W. Connors, Gordon D.
Woolbert, II, BLACK, McCUSKEY, SOUERS & ARBAUGH, Canton, Ohio, for
Appellants.  Dennis R. Rose, Eric B. Levasseur, Steven J. Mintz, HAHN, LOESER &
PARKS LLP, Cleveland, Ohio, for Appellees.

———————————

**OPINION**

———————————

JULIA SMITH GIBBONS, Circuit Judge.  This case involves allegations of fraud and misrepresentation in the issuance of securities related to oil and gas interests. Following a jury verdict for plaintiffs, defendants-appellants/cross-appellees Ohio Kentucky Oil Corporation ("OKO") and Carol L. Campbell, both individually and as executrix of the Estate of William M. Griffith, appeal numerous rulings of the district court. Plaintiffs-appellees/cross-appellants Gregory M. Nolfi, as successor trustee under the Frederick E. Nonneman declaration; Anita C. Nonneman, as executrix of the Estate of Frederick E. Nonneman; and Rena Nonneman[1] (together the "Nonneman plaintiffs") cross-appeal two additional issues.  For the reasons that follow, we affirm in full the decisions of the district court.

I.

This case stems from a series of investments made by Frederick E. Nonneman with OKO.  Nonneman invested money both personally and through Fencorp, a family investment corporation he formed in 1986.  Many of his investments were in domestic oil and gas, but he did not have any experience in drilling wells or running an oil and gas company.

Between 1986 and 2000, Nonneman personally invested a total of $6,520,995 with OKO in oil and gas partnerships and joint ventures.  Then, between 2001 and 2003, he substantially increased his rate of investment, investing an additional $8,383,046 with

———————————

[1]A fourth plaintiff, Fencorp Co. ("Fencorp"), was joined for trial at the district court.  Appeals involving the claims of Fencorp have proceeded under a separate docket number (09-4317) and were argued separately before this panel.  Our Fencorp opinion is filed simultaneously with this one.

OKO in his individual capacity.**²** Evidence showed that Nonneman expected to receive favorable tax treatment for his investments.

During the period in question—2000 to 2003—Nonneman was in his early eighties and was showing signs of dementia and suffering from disabilities. Eventually, Nonneman's family and advisors—concerned that he was incapable of managing his business affairs—arranged, with his consent, for Gregory Nolfi, a trusted business advisor, to assume management of Nonneman's affairs as successor trustee on November 5, 2003.

By this time it had become apparent that the OKO investments were not yielding returns. Nonneman had invested in thirty-three joint ventures and ten limited partnerships. The programs all involved oil and gas exploration—mainly drilling holes to find oil and gas—in the states of Kentucky, Tennessee, and Pennsylvania. Of the one hundred twenty-eight wells drilled, all but eleven were completely dry. The eleven that produced oil did not produce enough to recoup the investment, let alone return a profit to Nonneman.

Upon assuming control, Nolfi and Lois Nonneman, Frederick Nonneman's daughter, began investigating why Nonneman had invested so much money in joint ventures with OKO. Because Nonneman himself was unable to explain why—and in fact was surprised to learn the extent of his investments—Nolfi went to OKO to learn more about the transactions. After failing to obtain satisfactory answers from OKO, Nolfi and Lois Nonneman filed suit in Ohio state court. The state court lawsuit, filed December 22, 2004, alleged undue influence, common law fraud, breach of contract, and breach of fiduciary duty arising from the claim that over 90% of the oil and gas wells drilled by OKO resulted in dry holes.

---

**²**In its holding on Rule 12(b)(6) and summary judgment motions, the district court listed Nonneman's direct investment during the relevant period as $9,377,436. This figure differs from that listed by defendants and the plaintiffs, but the discrepancies are minor and, because the jury found an entirely different amount, irrelevant to the disposition of this appeal.

The Nonneman plaintiffs allege that they first learned of the facts and circumstances giving rise to the federal and state securities claims at issue here during discovery for the state fraud case. The Nonneman plaintiffs learned that William M. Griffith, the founder of OKO, and Carol L. Campbell, Griffith's daughter and the president of OKO during the relevant time period, had been persistent in their pursuit of sales to Frederick Nonneman. In numerous personal letters, Griffith touted the virtues of the drilling joint-ventures and included grandiose promises of rich rewards, promises not tempered by cautions or warnings that the exploratory drilling OKO planned had a low chance of success—less than 10% and sometimes less than 5%. Evidence also showed that Nonneman had grown to trust Griffith and that Griffith exploited that trust by pressing for more investment opportunities, encouraging hurried transactions, and bestowing gifts on Nonneman's wife.

Not only did the investments fail to deliver the promised returns, but also OKO's pricing and other behavior were suspicious. Although the investments were joint ventures and general partnerships, the investment terms provided that if no oil was found, OKO would keep any excess funds invested. As a drilling company, OKO made money by drilling the wells; then, if no oil was found, completion costs would be unnecessary, and OKO would make even more profit because it could keep the remainder of Nonneman's investment. Ostensibly for this reason, OKO did not drill in areas where it was likely to strike oil; one expert testified that OKO's wells had the lowest success rate he had ever seen. Another expert concluded: "[T]he apparent availability of investment capital (and not the discovery of oil and gas reserves) was the moving force in the company's operations, resulting in a flurry of drilling and acquisition activity that totally lacked economic performance."[3] Additional evidence revealed that OKO had overstated its costs and had billed substantial and unexplained

---

[3]The expert also reported that oil and gas interests that OKO purportedly owned in Pennsylvania were, in fact, not owned by OKO. Additionally, on some oil interests where OKO was supposed to drill in a joint venture with Nonneman, OKO instead declined to drill, let other companies drill in its place, and then failed to pay Nonneman the royalties. The expert called these actions "dishonest, and possibly fraudulent."

internal overhead, including expenses at restaurants and stores, employment of Griffith's family, and purchases of a personal plane, a house, and horses for Griffith.

After learning these facts, the Nonneman plaintiffs filed federal and state securities claims. With regard to federal claims, the Nonneman plaintiffs initially alleged only a violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b). After discovery, the Nonneman plaintiffs learned that OKO had engaged in a general solicitation to sell its investments, rendering it unqualified for the SEC filing exemption it had sought, and they filed a second securities claim under § 12(a)(1) of the Securities Act of 1933, 15 U.S.C. §77l(a)(1).

A series of federal and state common law and securities claims were eventually consolidated in the United States District Court for the Northern District of Ohio. Following defendants' motion to dismiss for failure to state a claim, the district court found that many of the §12(a)(1) claims were barred by the three-year statute of repose. The district court also declined to exercise supplemental jurisdiction over the Nonneman plaintiffs' Ohio state law claims. With only the federal securities claims remaining before the court, the district court denied defendants' motion to dismiss, finding that the complaint adequately pled particularity, *scienter*, reliance, and loss causation.

After discovery, both parties moved for summary judgment. The district court dismissed the remaining §12(a)(1) claims as barred by the one year statute of limitations. The court denied defendants' motion for summary judgment, finding that they had merely raised again the arguments previously deemed insufficient in their motion to dismiss and that there remained triable questions of fact. The court also denied plaintiffs' motion for summary judgment.

During trial, the district court ruled that the investments at issue were, as a matter of law, securities under §2(a)(1) of the Securities Act of 1933. Over defendants' objection, the district court also found that a rescission theory could provide a proper measure of damages for the §10(b) claims.

The case was tried before a jury. The jury found in favor of the Nonneman plaintiffs on their federal securities claims and determined that the rescission damages amounted to $7,700,723 for the Nonneman plaintiffs. Despite having stated the rescissory damages as over seven million dollars, however, the jury only listed an award of $1,777,909 on its verdict form.

Both parties filed post-trial motions. Defendants brought a Rule 50(b) motion, arguing they were entitled to judgment as a matter of law on the §10(b) claims. The district court denied their motion. Plaintiffs filed a post-trial motion to alter or amend the judgment, arguing they were entitled to rescissory damages by law. Because the jury stated rescissory damages were $7.7 million but only awarded $1.7 million, plaintiffs asked the court to amend the judgment to $7.7 million. The district court refused, finding that the Nonneman plaintiffs had waived this argument by failing to raise the issue prior to the discharge of the jury as required by Rule 49(b).

This appeal followed.

II.

Defendants raise a number of issues on appeal. They argue (1) that plaintiffs did not plead the securities claims with sufficient particularity, (2) that the district court erroneously denied their motion for summary judgment because plaintiffs failed to present sufficient evidence to support their securities claims, (3) that the district court erred in denying their Rule 50 motions, and (4) that the jury instructions incorrectly stated the law. We address each argument in turn.

Defendants' first two arguments are that plaintiffs did not plead the securities claims with sufficient particularity and that summary judgment should have been granted to defendants because plaintiffs failed to present sufficient evidence to support their securities claims. Because the two arguments are governed by the same Supreme Court precedent, we address them together.

Under this court's prior precedent, a denial of summary judgment was often not appealable after a jury verdict, but this rule only applied when the district court's ruling

on the summary judgment motion was based on a determination that there were no disputed facts. *See Adam v. J.B. Hunt Transport, Inc.*, 130 F.3d 219, 231 (6th Cir. 1997). Under *Adam*, where motions to dismiss and for summary judgment were based on questions of law, *de novo* appellate review was proper. Defendants argue that whether plaintiffs met their pleading and evidentiary burdens under the Private Securities Litigation Reform Act of 1995, Pub. L. 104-67, 109 Stat. 737 ("PSLRA"), and Federal Rule of Civil Procedure 9(b), as delineated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), is a question of law that may be reviewed.

Recently, however, the United States Supreme Court overturned this court's prior rule permitting some summary judgment appeals after a jury trial. In *Ortiz v. Jordan*, the Court addressed our rule directly and held that a party may not "appeal an order denying summary judgment after a full trial on the merits." 131 S. Ct. 884, 888–89 (2011). The Court noted that summary judgment maintains its interlocutory appealability only as "a step along the route to final judgment." *Id.* at 889. "Once the case proceeds to trial, the full record developed in court supersedes the record existing at the time of the summary judgment motion." *Id.* Furthermore, after a jury verdict is returned, "the defense must be evaluated in light of the character and quality of the evidence received in court." *Id.* Because most of defendants' summary judgment appeal is based on the evidence presented prior to trial, not the evidence received at trial, we are precluded by *Ortiz* from reviewing the denial of their motion for summary judgment in large part.

We consider one purely legal issue that defendants raise: whether plaintiffs' loss causation theory is actionable under §10(b). Because *Ortiz* leaves open the possibility that cases "involv[ing] . . . [only] disputes about the substance and clarity of pre-existing law" may still be considered, *id.* at 892, we briefly address this argument. *See also Owatonna Clinic–Mayo Health Sys. v. Med. Protective Co. of Fort Wayne, Ind.*, 639 F.3d 806, 809–10 (8th Cir. 2011) (recognizing that *Ortiz* did not address the issue of whether a denial of a summary judgment motion was appealable after a final judgment if the denial was based on a legal question rather than on the existence of material facts

in issue).  Defendants cite *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), for the proposition that an inflated purchase price is not an actionable economic loss under §10(b).  Defendants suggest that the investments at issue here are similarly not actionable.   *Dura*, however, involved the purchase of stock in a pharmaceutical company. The purchase of stock in a company that is traded on the open market is far different investment from a partnership with an oil company that has no intention of actually finding oil.  The stockholders in *Dura* received stock at a price that may have been inflated by misrepresentations but which still retained real value; the plaintiffs in this case purchased interests in oil drilling ventures from a company that was not actually interested in drilling for oil and whose interests are now completely worthless.  The cases are not analogous.  The district court found this legal argument without merit, and we agree.

*Ortiz* also precludes our consideration of defendants' appeal from the district court's denial of its motion to dismiss.  Though *Ortiz* applies specifically to summary judgment, its logic applies with equal force to questions involving pleadings.

III.

Defendants further argue that the district court improperly denied their motions brought under Fed. R. Civ. P. 50.  A ruling on a Rule 50 motion is reviewed *de novo*, both as to law and as to sufficiency of the evidence.  *K &T Enters., Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 175–76 (6th Cir. 1996).  This court has held that a Rule 50 motion should be treated similarly to a Rule 56 motion, with the evidence viewed "in the light most favorable to the party against whom the motion is made, and that party given the benefit of all reasonable inferences." *Id.* at 176.

A.

Defendants first assert that the district court erred in denying its Rule 50 motion by concluding as a matter of law that plaintiffs' partnership and joint-venture interests are securities.  Defendants argue that sales of assignments of oil and gas leases do not constitute the oil and gas interests or instruments specified by the Securities Exchange

Act of 1933, 15 U.S.C. § 77b(a)(1), and clarified by *S.E.C. v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 352 (1943).[4]  The district court's error, according to defendants, is that the jury needed to determine whether the investments are "investment contracts" as determined by the *Howey* test:  "whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others."  *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946).  Defendants argue that the district court erred in making this determination as a matter of law.

The *Howey* test is inapplicable.  The statute specifically lists "fractional undivided interests in oil, gas, or other mineral rights" as a security.  Defendants wrongly equate the OKO investments with "investment contracts"—instead of admitting they are the "fractional undivided interests" listed in the statute—in order to advocate use of the *Howey* test.  At least five circuits have accepted or suggested that fractional undivided interest in oil and gas is a security under the statute, while no circuit has held otherwise.  *See Adena Exploration Inc. v. Sylvan*, 860 F.2d 1242, 1244–45 (5th Cir. 1988) (listing cases holding the same and noting that no circuit has held otherwise).[5]  If the OKO investments are fractional undivided interests in oil or gas, then the statute specifies that they are securities as a matter of law.

The OKO investments are analogous to the working interest in oil that the Fifth Circuit classified as a security under the Act in *Adena Exploration*.  *Id.* at 1249. Nonneman purchased what was proposed to be a 50% share in numerous oil wells.  A 50% interest in a well is, by its plain meaning, a "fractional undivided interest." Defendants' assertion that Nonneman purchased "an assignment of an oil and gas lease"

---

[4] 15 U.S.C. § 77b(a)(1) provides: "The term 'security' means any note, stock, treasury stock, . . . *fractional undivided interest in oil, gas, or other mineral rights*, . . . or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing." (emphasis added)

[5] This court has not previously settled this question.  We addressed the scope of "fractional undivided interests" under § 77b(a)(1) in *Graham v. Clark*, 332 F.2d 155 (6th Cir. 1964), but *Graham* is not applicable to this case.  In *Graham*, we found that when a party purchased oil leases for $72,500 and paid for them in part with a promise of a quarter interest in the oil produced, the sale did not constitute an "undivided fractional interest" under the statute. *Id.* at 156.  Rather, the purchase was analogous to a purchase of land that included a lien on the property.  A direct purchase of an oil lease, with the purchase guaranteed by oil production, is distinct from partnership and joint-venture investments in speculative oil wells.

is wrong—Nonneman purchased a working interest in a well, not an assignment of a lease on mineral rights. Defendants argue that Nonneman's interest was analogous to that examined by the Supreme Court in *C.M. Joiner*; that case, however, involved a leasehold interest in land near a proposed oil well and is not analogous to these investments. *C.M. Joiner*, 320 U.S. at 345–46. Rather, the arrangement here is similar to that in *Adena Exploration*, where a party who had purchased a 50% interest in a working oil well sued because the operator "had been charging off certain overhead costs against the lease costs, thus effecting a 'mark up.'" *Adena Exploration*, 860 F.2d at 1243.

In holding that such an interest constituted a security, the Fifth Circuit concluded, "[The] test is simple: if a fractional undivided interest is created for the purpose of sale, the conveyance of the interest is the sale of the security." *Id.* at 1246; *see also Woodward v. Wright*, 266 F.2d 108, 114 (10th Cir. 1959) (noting that fractional interests conveyed in oil and gas leases owned by the seller, if created for the purpose of sale, are securities within the meaning of the [1933 Act]). *Adena Exploration* and *Woodward* are persuasive and state the proper test. The OKO investments—fractional undivided interests created by OKO for the purpose of sale—are securities as a matter of law. We therefore affirm the district court's denial of defendants' Rule 50 motion on the issue of whether the interests purchased by Nonneman are securities as a matter of law.

B.

Defendants next argue that the district court erred in denying their Rule 50(b) motion arguing that the § 10(b) claims were barred by the two-year statute of limitations. Defendants assert that the district court should have granted their Rule 50(b) motion because "the evidence indicates that plaintiffs had either actual or constructive notice of their federal securities claims more than two years prior to filing their complaint." Defendants state that a party is under a duty to investigate and learn about a potential § 10(b) claim from the moment the party becomes aware of "suspicious facts" or "storm warnings." *See New England Health Care Emps. Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 501 (6th Cir. 2003). Once a party is aware of such "storm warnings,"

defendants claim that party has a duty to investigate, which puts the party on inquiry notice. Defendants argue that plaintiffs were on inquiry notice from February 2002, at which time they knew many of the wells were dry; therefore, the statute of limitations ended long before plaintiffs brought suit.

We disagree. Recently, the United States Supreme Court clarified that, because scienter is a requirement for a §10(b) claim and a plaintiff cannot prevail "without proving that a defendant made a material misstatement *with an intent to deceive*," inquiry notice of scienter is necessary before a § 10(b) claim's two-year statute of limitations period begins to run. *Merck & Co., Inc. v. Reynolds*, 130 S. Ct. 1784, 1796 (2010). Furthermore, "discovery" of a § 10(b) claim means, in addition to actual discovery, the point at which "a reasonably diligent plaintiff would have discovered 'the facts constituting the violation,'" *id.* at 1798, not when a reasonable "plaintiff would have *begun* investigating." *Id.* at 1797 (emphasis in original). The Court specifically noted that the very purpose of the discovery provision would be frustrated if a defendant could conceal a misstatement for two years with an intent to deceive and thus avoid the statute. *Id.*

The facts, which we construe in favor of the plaintiffs, showed that OKO concealed its intent to deceive. Lois Nonneman and Gregory Nolfi repeatedly asked for information from OKO but were stymied. They eventually had to file suit in state court to get information, and it was only through discovery in the state case—occurring between December 2004 and January 2006— that they learned the facts which made them aware of an intent to deceive and gave them grounds for a §10(b) claim. Because knowledge of the intent to deceive was not something the plaintiffs could have known prior to the state court discovery, pursuant to *Merck*, the statute of limitations did not begin to run until then. Plaintiffs' claims were therefore not barred by the statute of limitations.

C.

Defendants also assert that the district court should have granted their Rule 50(b) motion because plaintiffs did not present sufficient evidence that Nonneman relied on misrepresentations or omissions while investing with OKO. Defendants' argument centers on the investment documents, which included clauses disclaiming reliance on extra-contractual representations. Asserting that there is no real evidence to the contrary, defendants state that the non-reliance clauses in the contract establish that plaintiffs' evidence was insufficient.

This court has rejected a *per se* rule that non-reliance clauses foreclose the possibility of recovery. *Brown v. Earthboard Sports USA, Inc.*, 481 F.3d 901, 921 (6th Cir. 2007). Rather, we engage in a contextual analysis in which factors considered include:

> (1) The sophistication of expertise of the plaintiff in financial and securities matters; (2) the existence of long standing business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations.

*Id.* (internal quotations omitted). When such a contextual analysis is undertaken, with the facts construed in favor of the plaintiffs, the evidence shows that Nonneman was of frail health and mind, that he trusted Griffith as a friend, that neither Nonneman nor his associates had information regarding OKO's business model, that there was a fiduciary relationship under Ohio law, and that Griffith initiated most of the transactions by approaching Nonneman and giving him little time to make a decision.

Viewed within the requisite contextual analysis, there was sufficient evidence Nonneman justifiably relied on defendants' misrepresentations.

IV.

Defendants' final argument is that the jury instructions incorrectly stated the law. Defendants challenge three elements of the district court's instructions to the jury: (1) that reliance may be presumed for the § 10(b) omission claims, (2) that the measure of damages for the § 10(b) claims is the purchase price (*i.e.*, rescission), and (3) that tax benefits received by the Nonneman plaintiffs should not be deducted from the damages award. This court reviews the correctness of jury instructions *de novo*, but on appeal the standard is "whether the charge, taken as a whole, fairly and adequately submits the issues and applicable law to the jury." *Fisher v. Ford Motor Co.*, 224 F.3d 570, 575–76 (6th Cir. 2000).

A.

First, defendants argue that the district court erred by instructing the jury, "[w]hen a claim is based upon an omission, positive proof of reliance is not a prerequisite to recovery. . . . In the case of the omission of a material fact, the elements of reliance by the plaintiffs may be presumed." Although defendants concede that an omission by one with a duty to disclose may lead to a presumption of reliance, they argue that there was no fiduciary or similar relation of trust that would lead to such a duty and that whether such a relationship existed was a factual question for the jury to determine.

A duty to disclose under § 10(b) arises "when one party has information that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them." *Chiarella v. United States*, 445 U.S. 222, 228 (1980) (internal quotations omitted). "[I]f there is an omission of a material fact by one with a duty to disclose, the investor to whom the duty was owed need not provide specific proof of reliance." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 159 (2008). Pursuant to *Stoneridge*, if Nonneman had a fiduciary relationship or other similar relation of trust with defendants, then the instruction that reliance may be presumed is correct as a matter of law.

Defendants owed a fiduciary duty to Nonneman.  There was abundant evidence that a relationship of trust and confidence existed between Nonneman and Griffith. Moreover, the agreements signed between Nonneman and OKO were general partnerships, and under Ohio law at the time, partners owed a fiduciary duty to each other.  *Dunn v. Zimmerman*, 631 N.E. 2d 1040, 1042 (Ohio 1994) ("Partners in Ohio owe a fiduciary duty to one another.").[6]  Because the "fiduciary duty" is not defined under § 10(b) itself, courts have incorporated state law definitions of fiduciary duty. *See, e.g., Jordan v. Duff & Phelps, Inc.*, 815 F.2d 429, 436 (7th Cir. 1987) ("The obligation to break silence [as a condition of a § 10(b) claim] is itself based on state law . . . and so may be redefined to the extent state law permits." (internal citations omitted)).[7]  The district court concluded as a matter of law—and instructed the jury—that in Ohio "[a] general partner owes a fiduciary duty . . . [to] the other partners." We agree.  Because defendants owed a fiduciary duty to Nonneman as a matter of law, reliance may be presumed.

B.

Second, defendants argue that the district court's instruction on the measure of damages was erroneous.  The district court gave the following instruction:

> Rescission . . . may be awarded against the seller or broker of the securities to restore the plaintiffs to the position they would have been in had the defendants not misrepresented or omitted material facts. . . . Rescission cancels the original purchase and allows the plaintiffs to recover the price paid, plus interest.

Defendants, citing *Dura Pharmaceuticals, Inc. v. Broudo* and the PSLRA, argue that recovery should be limited to the economic losses actually caused by the misrepresentations and that the district court abused its discretion by refusing to provide an instruction to this effect.

---

[6] The state law upon which *Dunn* was based was repealed subsequent to the Nonneman-OKO dealings. *See* O.R.C. 1775.20(A) (repealed January 1, 2010).

[7] For more on the incorporation of state law fiduciary duties by federal courts determining § 10(b) claims, *see* Stephen M. Bainbridge, *Incorporating State Law Fiduciary Duties into the Federal Insider Trading Prohibition*, 52 Wash. & Lee L. Rev. 1189 (1995).

We disagree.  As we have noted above, *Dura* is not analogous to this case.  In *Dura*, plaintiffs alleged that false public statements by a pharmaceutical company had inflated the stock price, causing the investors to lose money once the truth came out.  *Dura*, 544 U.S. at 339–40.  The Court found plaintiffs' pleadings were inadequate because they did not let the defendants know "what the causal connection might be between that loss and the misrepresentation."  *Id.* at 347.  This makes sense in *Dura*, where the stock continued to fluctuate on the market.  Here, however, there is no question what the causal connection is between the loss and the misrepresentation.  The misrepresentation caused the complete loss of plaintiffs' entire investment because the wells were worthless, and the investments were fraudulent.  A private sale of worthless investments by a company intending to keep the profits by drilling dry wells is in no way analogous to the public  sale of stock by a major corporation.

Moreover, the loss causation requirement of the PSLRA, which  provides that, "the plaintiff shall have the burden of proving that the act or omission . . . caused the loss for which the plaintiff seeks to recover damages," 15 U.S.C. § 78u-4(b)(4), does not preclude rescission damages as a potentially appropriate measure of damages.  A district court does not abuse its discretion by including a rescission theory in the jury instructions on the proper measure of damages where, as here, plaintiffs have established that the loss was complete and was caused entirely by defendants' misrepresentation.

This court has previously recognized rescission as an appropriate measure of damages for a § 10(b) claim.  *See Stone v. Kirk*, 8 F.3d 1079, 1092 (6th Cir. 1993) ("[I]n some circumstances, at least, it appears that the plaintiff in a § 10(b)/Rule 10b-5 case may elect to obtain rescissory damages in lieu of out-of-pocket damages." (citing *Randall v. Loftsgaarden*, 478 U.S. 647, 661 (1986)); *Bass v. Janney Montgomery Scott, Inc.*, 152 F. App'x 456, 458 (6th Cir. 2005).  While *Stone* and *Bass* are pre-PSLRA cases that focus, primarily, on §12(a)(2) claims, we find nothing in the PSLRA that  would make rescissory damages inappropriate for the circumstances of this case; indeed, since the misrepresentations caused plaintiffs to lose their entire investment, rescission appears to be the only truly adequate remedy.  We emphasize that rescission is a fact-dependent

remedy for § 10(b) claims and is likely only appropriate in rare or unusual circumstances.  But in this case there was no error in the jury instruction.

C.

Third, defendants challenge the district court's instruction that tax benefits should not be deducted from the recovery.  Defendants argue that Nonneman received a large tax benefit from the investments, which should have been deducted from the recovery.

We disagree.  In *Randall v. Loftsgaarden* the Supreme Court definitively held that tax benefits are not deducted from rescissory recovery so as to deter bad actors: "Th[e] deterrent purpose is ill served by a too rigid insistence on limiting plaintiffs to recovery of their 'net economic loss.'  The effect of allowing a tax benefit offset would often be substantially to insulate those who commit securities frauds from any appreciable liability to defrauded investors."  478 U.S. at 647, 664 (1986) (internal citation omitted).  This court has applied that holding, as we must.  *Fleischhauer v. Feltner*, 879 F.2d 1290, 1300–01 (6th Cir. 1989).[8]  We therefore affirm the district court's jury instruction.

V.

Plaintiffs also appeal two of the district court's rulings.  Plaintiffs' first contention on the cross-appeal is that the district court erred by refusing to amend the judgment to award them full rescission.  Although the jury found the rescission amount was $7,700,723, the jury only awarded the Nonneman plaintiffs $1,777,909.  Plaintiffs argue that, if they were entitled as a matter of law to full rescission, then the award of $1.7 million has left them "massively under-compensated for their losses."

---

[8]In their reply brief, defendants suggest that the PSLRA has limited recovery to "losses caused by misrepresentations or omissions," but defendants cite no law to support this assertion.  The PSLRA states that plaintiffs have the burden of proving loss causation, but that in no way limits the damages that are available.  We see no reason that the PSLRA requires that we now deduct tax benefits from rescissory damages.

Initially, by way of background, we note that the jury instructions and verdict form are not models of clarity on the issue of damages for the federal claim. The jury instructions charged rescissory damages as a permissible measure of damages for the federal claims. They did not mention any other measure of damages for these claims, but they also did not require the jury to award rescissory damages in the event it decided plaintiffs were entitled to damages on the federal claims. The verdict form suggested in question 1-G that recissory damages were the appropriate measure but then in questions 1-H and 1-I gave the jury the opportunity to compute damages based on the losses proximately caused by defendants' fraud—a measure that does not require rescissory damages. The jury availed itself of the opportunity afforded by questions 1-H and 1-I and awarded lesser amounts than the amount of rescissory damages.[9]

The district court found that plaintiffs waived their right to challenge the verdict by not raising the issue, prior to discharge of the jury, under Fed. R. Civ. P. 49(b). As we have previously held:

> [I]f, after answers to special interrogatories are read, a party does not object to the discharge of the jury or raise any issue with respect to the jury's responses, that party should be deemed to have waived any objection as to inconsistency, ambiguity, or lack of clarity in the answers. . . . The purpose of the rule is the allow the original jury to eliminate any inconsistencies without the need to present the evidence to a new jury. This prevents a dissatisfied party from misusing procedural rules and obtaining a new trial for an asserted inconsistent verdict.

*Radvansky v. City of Olmsted Falls*, 496 F.3d 609, 618 (6th Cir. 2007) (quoting *Central On Line Data Sys., Inc. v. Filenet Corp.*, 99 F.3d 1138, 1996 WL 483031, at *11 (6th Cir. 1996) (table)). If the jury's verdict was inconsistent,[10] pursuant to *Radvansky*, plaintiffs should have moved under Rule 49(b) for the jury to further consider its

---

[9]Plaintiffs have raised no issue about the language of the instructions or the verdict form at trial or on appeal.

[10]As noted, the jury's verdict may have been inconsistent, but the record does not conclusively establish that the district court concluded that plaintiffs were entitled to rescissory damages as a matter of law, if they prevailed.

answers.  It was not error for the district court to find plaintiffs waived their right to challenge the verdict.

Plaintiffs counter that the district court should have amended the judgment under Fed. R. Civ. P. 59(e).  In this circuit, a district court may alter a judgment under Rule 59 based on (1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) a need to prevent manifest injustice.  *Leisure Caviar, LLC v. United States Fish & Wildlife Serv.*, 616 F.3d 612, 615 (6th Cir. 2010).  Plaintiffs argue that the jury's $1.7 million award is both a clear error of law and a manifest injustice.

We review the denial of a Rule 59(e) motion for abuse of discretion, which occurs when a district court relies on clearly erroneous findings of fact or when it improperly applies the law.  *Intera Corp. v. Henderson*, 428 F.3d 605, 619–20 (6th Cir. 2005); *see also Leisure Caviar*, 616 F.3d at 615 ("A district court, generally speaking, has considerable discretion in deciding whether to grant [a Rule 59(e)] motion.").[11]

The district court did not abuse its discretion.  The district court neither relied on erroneous facts nor improperly applied the law in question, which here was to deny the Rule 59(e) motion because of the Rule 49(b) waiver rule.  Rule 49(b)(4) allows objections when a jury's answers "are inconsistent with each other and one or more is also inconsistent with the general verdict."  Fed. R. Civ. P. 49(b)(4).  In this case, two interrogatories were arguably inconsistent with each other, and the instructions of one interrogatory were inconsistent with the award of $1.7 million.  Our precedent requires a party to bring a Rule 49(b) motion when there is an inconsistency, which plaintiffs failed to do.  A party that fails to do so has waived its right to object.  The district court's reading of Rule 49(b) and application of the waiver rule was a correct application of the

---

**11**Plaintiffs note that this court reviews *de novo* "when the lower court rejects an application under Rule 59(e) based upon an erroneous legal doctrine."  *See Huff v. Metro. Life Ins. Co.*, 675 F.2d 119, 122 n.5 (6th Cir. 1982).  Plaintiffs argue that we should use *de novo* review because the 59(e) motion was predicated on an alleged legal error by the jury.  This argument misses the point.  The district court rejected application of Rule 59(e) because of the Rule 49(b) waiver rule.  The district court's use of Rule 49(b) waiver is not "an erroneous legal doctrine"; therefore, we review for abuse of discretion.

law and based on the indisputable fact that plaintiffs did not object; therefore, the district court did not abuse its discretion.**[12]**

## VI.

Plaintiffs' second contention on cross-appeal is that the district court erred in dismissing their claims under §12(a)(1), 15 U.S.C. §77l(a)(1), as barred by the statute of limitations.

The relevant statute of limitations states that a §12(a)(1) claim cannot be maintained "unless brought within one year after the violation upon which it is based." 15 U.S.C. § 77m.**[13]**   Plaintiffs, however, contend that equitable tolling should extend their limitations period because the facts pertaining to the securities' exemption status were concealed to them until discovery in the state court litigation.

We affirm the district court.  Because the statute permits claims under §12(a)(2) to proceed if brought within one year of discovery of the violation but does not have a similar discovery rule for § 12(a)(1) claims, Congress's intent on this matter is clear and that the express language of the statute should be applied.  Although we assume that "Congress legislates against the backdrop of existing jurisprudence unless it specifically negates that jurisprudence," *Souter v. Jones*, 395 F.3d 577, 598 (6th Cir. 2005), the fact that the statute plainly fails to include a discovery rule for § 12(a)(1)—when juxtaposed with a provision within the same sentence specifically allowing it for § 12(a)(2)—shows that Congress intended to negate equitable tolling in this context.  This holding is in

---

**[12]** We also note that plaintiffs brought a Rule 49(b) motion with regard to an inconsistency in the verdict for Fencorp.  For the plaintiffs to have objected to one inconsistency while failing to object to another was their error.

**[13]** 15 U.S.C. § 77m provides in full:

No action shall be maintained to enforce any liability created under section 77k or 77l(a)(2) of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence, or, if the action is to enforce a liability created under section 77l(a)(1) of this title, unless brought within one year after the violation upon which it is based. In no event shall any such action be brought to enforce a liability created under section 77k or 77l(a)(1) of this title more than three years after the security was bona fide offered to the public, or under section 77l(a)(2) of this title more than three years after the sale.

keeping with the interpretive canon, *expressio unius est exclusio alterius*. Congress expressly mentioned a discovery rule for § 12(a)(2) claims but not for § 12(a)(1). This decision puts us in line with the majority of other circuits and the majority of district courts that have considered the question. *See Cook v. Avien, Inc.*, 573 F.2d 685, 691 (1st Cir. 1978) ("We hold that, under the explicit language of [the statute], the limitations period runs from the date of the violation irrespective of whether the plaintiff knew of the violation."); *Gridley v. Cunningham*, 550 F.2d 551, 552–53 (8th Cir. 1977) (stating that a § 12(a)(1) claim must be brought within one year of the violation, finding that the statute of limitations period had passed, and not permitting the claim to proceed under Fed. R. Civ. P. 15(c) as an amendment relating back to an original contract claim); *Blatt v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 916 F.Supp. 1343, 1352–53 (D. N.J. 1996) (finding that the statute provides an absolute one year limitation, listing federal district court opinions that have considered the issue, and noting that the majority view is that equitable tolling is not permitted). *But see Katz v. Amos Treat & Co.*, 411 F.2d 1046, 1055 (2d Cir. 1969) (allowing equitable tolling where a party said it was in the process of registering securities when, in fact, it was not).[14] Therefore, the district court correctly held that equitable tolling does not apply to § 12(a)(1) claims.

VII.

For the foregoing reasons, we affirm in full the district court's judgment.

---

[14]Plaintiffs counter by citing our decision in *Souter v. Jones*, 395 F.3d 598. *Souter*, however, involved interpretation of the Antiterrorism and Effective Death Penalty Act's one year limitation period. *Id.* at 580; *see* 28 U.S.C. § 2244(d)(1). Section 77m compares two different substantive violations and sets out different limitation periods, while AEDPA makes no such comparison. The *Souter* court was therefore not limited by the *expressio unius* interpretive canon that informs our decision here. *Souter* is therefore not analogous.