NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a1007n.06

No. 10-3342

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

***Sep 12, 2012***

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| J-Way Leasing, Ltd., dba J-Way Leasing & Marine, LLC, | ) ) ) | |
| Plaintiff-Appellee, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE |
| v. | ) ) | NORTHERN DISTRICT OF OHIO |
| American Bridge Company, and American Bridge/McLean Pier 11 Constructors, a Joint Venture, | ) ) ) | O P I N I O N |
| Defendants-Appellants. | ) | |

BEFORE: BOGGS, McKEAGUE, Circuit Judges, and WATSON, District Judge.[*]

**McKeague, Circuit Judge.** This case arises out of a Navy Contract that was awarded to a joint venture comprised of American Bridge and McLean Pier 11 Constructors. The Plaintiff, J-Way, orally agreed to perform dredging work as a subcontractor to American Bridge. After the work was completed, J-Way sued both American Bridge and the joint venture, alleging that Defendants owed J-Way money under both a breach of contract and a *quantum meruit* theory. After the trial, the jury was tasked with answering seven interrogatories and rendering two general verdicts; the trial court also expressly instructed the jury that it could consider the *quantum meruit* theory only if it

---

[*]The Honorable Michael H. Watson, U.S. District Judge for the Southern District of Ohio, sitting by designation.

found there was no contract. Exhibiting some confusion, the jury determined that there was an oral contract between J-Way and American Bridge and that American Bridge breached the oral contract. It then went on to award damages for J-Way under the *quantum meruit* theory. Defendants appeal the district court's denial of their motions for judgment as a matter of law and a new trial.

## I. BACKGROUND

In 2004, Defendants American Bridge Company ("American Bridge") and McLean Pier 11 Constructors formed a joint venture (the "Joint Venture") to bid on a Navy contract for the demolition and construction of a pier at the Norfolk Naval Base (the "Project"). According to the terms of the Joint Venture Agreement, McLean was responsible for all the demolition work on the Project, including demolition of the existing piers/breakwater, and removal of all debris down to the top of the dredge elevation. This required the Joint Venture, through McLean, to demolish and dispose of the existing concrete pier structure in its entirety.

American Bridge was only responsible for the bucket-dredging part of the Project. The Navy anticipated that bucket dredging for this Project would involve removing "dredge material" such as dirt, mud, or sand on the floor of the river bed. In addition, the Navy also made clear that bucket dredging may involve removing "perhaps incidental light shipyard trash such as metal bands, pallets, pieces of broken cable, rope, fire hoses, and broken pile which may have fallen off Pier 11 over the years." Based on these specifications, the Joint Venture bid to fulfill the bucket-dredging portion of the work for $8.89 per cubic meter of dredge material.

The Navy awarded the Project to the Joint Venture for $91,552,100. American Bridge subsequently decided to subcontract part of its responsibility for the bucket dredging work.

Accordingly, American Bridge provided multiple companies, including J-Way Leasing, Ltd. ("J-Way") and Great Lakes Dredge & Dock Co. ("Great Lakes"), with the Navy's specifications for the work and invited them to submit a proposal to complete the dredging work as a subcontractor. American Bridge rejected all of the initial bids for the work because the subcontractors' estimates were substantially higher than the Joint Venture's committed price of $8.89 per cubic meter. J-Way submitted a revised written proposal to perform only the bucket dredging portion of the project at a rate of $9.25 per cubic meter along with payment of $325,000 for mobilization costs and $170,000 for debris and piling removal. J-Way's pricing offer did "not include the removal of any large or extraordinary debris." (R. 176, Tr. 10/07/09, p. 156; R. 183, Tr. 10/15/09, p. 53.) American Bridge also rejected J-Way's second proposal.

American Bridge and J-Way held a meeting on February 11, 2006, to continue their negotiations (the "February 11th meeting"). At the February 11th meeting, the parties orally agreed that J-Way would perform the bucket dredging work for $8.83 per cubic meter. (R. 101, Joint Statement of Stipulated Facts.) The parties also agree that they discussed at the February 11th meeting "the size of the concrete debris" to be bucket dredged, but the stipulated facts do not indicate what the parties' agreed-upon parameters were for the size of the debris, if any. (*Id.*) According to J-Way, the parties determined at the February 11th meeting that J-Way would only remove "debris" that was "basketball size or smaller." (Appellee's Br. 15.)

According to American Bridge, however, the February 11th meeting did not result in a binding contract. Accordingly, shortly after the parties reached an oral agreement, American Bridge sent J-Way a formal written subcontract along with a cover letter. Among other things, the cover

letter "advised that if American Bridge failed to hear from J-Way and J-Way began to perform, American Bridge would assume that J-Way had accepted all the terms included in the written subcontract." (Appellant's Br. 21.) Although J-Way informed American Bridge that it was "marking up" the contract, American Bridge did not receive the marked-up version until after the bucket-dredging work was completed, (R. 101, Joint Statement of Stipulated Facts), and J-Way admits that it never signed or executed a mutually acceptable version of the written subcontract agreement. (Appellee's Br. 16.)

Despite these differences, J-Way began dredging operations on April 24th. (R. 178, p. 319.) Two days later, J-Way subcontracted with Great Lakes to perform part of its duties for the Project. (R. 101, Joint Statement of Stipulated Facts.) The Agreement "called for Great Lakes to be paid $43,500 per day. In exchange, Great Lakes provided the Dredge 51 Vessel and crew for bucket dredging services under the direction of J-Way, along with two material dump scows, a tugboat, and a survey launch boat." (*Id.*) The subcontract between J-Way and Great Lakes was arranged by American Bridge; American Bridge declined to hire Great Lakes directly because J-Way was owned by a woman, thereby satisfying the Joint Venture's contractual obligation to the Navy to include a minority/woman business participant in the Project. (Appellant's Br. 25; Appellee Br. 17.)

J-Way completed the bucket-dredging work on July 21, 2006 and demobilized its operations on the Project. (R. 101, Joint Statement of Stipulated Facts.) According to the Navy's pre- and post-dredge surveys, J-Way bucket dredged 165,262 cubic meters. (*Id.*) The Joint Venture paid J-Way for dredging 160,661 cubic meters at $8.83 per cubic meter, plus $175,000 in mobilization costs, for a total payment of $1,593,636.63. (*Id.*)

J-Way was unsatisfied with this remuneration for three reasons. First, even according to the Navy's own surveys, J-Way was not paid for 4,601 cubic meters worth of dredging that it conducted ($40,626.83). Second, J-Way complains that it was forced to remove demolition debris outside the scope of its agreement. Specifically, J-Way asserts that "[t]he Joint Venture, through its partner McLean, dumped large amounts of Pier 11 demolition debris back in the water instead of removing it, which was confirmed by American Bridge's own monitors . . . as well as the dredgers that were on-site." (Appellee's Br. 18.) According to J-Way, its "entire dredging operation was negatively impacted and slowed by the out-of-scope demolition debris it was forced to remove in order to complete its required dredging." (*Id.*) Third, J-Way "encountered unforeseen layers of subsurface hard material during its dredging operations that were not included in its scope of work and differed materially from what was shown on the Navy plans." (Appellee's Br. 21.)

In December 2006, J-Way wrote to American Bridge seeking additional money because of these circumstances. (R. 101, Joint Statement of Stipulated Facts.) In support of its request, J-Way included a November 15, 2006 geotechnical report that was prepared on J-Way's behalf. (*Id.*) In March of 2007, J-Way submitted additional invoices for work it considered beyond the scope of its original agreement. (*Id.*) American Bridge sought $1,020,946 in additional compensation from the Navy on the basis of the sand being harder than expected, but the Navy denied this request. (*Id.*)

American Bridge refused to award any additional compensation to J-Way. Meanwhile, Great Lakes invoiced J-Way a total of $3,448,835 for its services and equipment on the Project, and J-Way has paid Great Lakes only $1,349,650. (*Id.*) J-Way sued both American Bridge and the Joint Venture for the difference, claiming that the amount of work performed was beyond the scope of the

agreement. In the alternative, J-Way requested *quantum meruit* damages. Defendants countersued for breach of contract.

At trial, to establish the amount of damages under the breach-of-contract claim, J-Way submitted the testimony of its bucket-dredging expert, Jim Thomas, who calculated damages using the "total cost" method. The "total cost" method is a technique used to determine breach-of-contract damages where extra costs were incurred and unique job-site circumstances make it difficult for a contractor to prove its actual losses directly. *Cleveland Constr., Inc. v. Ohio Pub. Emps. Ret. Sys.*, 2008-Ohio-1630 (Ct. App. 2008).

At the end of the jury trial, the court instructed the jury that it could find *quantum meruit* damages only if it found no contract between J-Way and American Bridge: "[If] the plaintiff doesn't prove that there was an oral contract on February 11, 2006 you then and only then may consider whether there was an agreement that's based on the quantum meruit theory . . . ." (R. 189, Tr. 10/21/2009.) This instruction was repeated again just before the jury was released for deliberation: "So the only time you get to quantum meruit is if you find there was no written contract or no oral contract." (R. 189, Tr. 10/21/2010.)

The jury returned the following answers to the Interrogatories and Verdicts:

**Interrogatory Number 1**
Did Plaintiff prove by a preponderance of the evidence that there was an oral contract between Plaintiff and Defendant American Bridge Company entered on February 11, 2006?
  Yes   **(insert in ink "YES" or "NO" according to your findings)**

**Interrogatory Number 2**
If your answer to Interrogatory No. 1 was "yes," did Plaintiff prove by a preponderance of the evidence that Defendant American Bridge Company breached the contract?
  Yes  **(insert in ink "YES" or "NO" according to your findings)**

**Interrogatory Number 3**
Did Defendants prove by a preponderance of the evidence that there was a written contract between Plaintiff and Defendants?
  No  **(insert in ink "YES" or "NO" according to your findings)**

**Interrogatory Number 4**
If your answer to Interrogatory No. 3 was "yes," did Defendants prove by a preponderance of the evidence that Plaintiff breached the contract?
       **(insert in ink "YES" or "NO" according to your findings)**
[The jury left Interrogatory No. 4 blank]

**Interrogatory Number 5**
If you found that there was no contract between the parties, did Plaintiff prove by a preponderance of the evidence that Plaintiff conferred a benefit directly on Defendants American Bridge and the Joint Venture?
  Yes  **(insert in ink "YES" or "NO" according to your findings)**

**Interrogatory Number 6**
If your answer to Interrogatory No. 5 is "yes," did Plaintiff prove by a preponderance of the evidence that Defendants American Bridge and the Joint Venture knew they received, and retained, the benefit?
  Yes  **(insert in ink "YES" or "NO" according to your findings)**

**Interrogatory Number 7**
If your answer to Interrogatory No. 6 is "yes," did Plaintiff prove by a preponderance of the evidence that Defendants American Bridge and the Joint Venture's retention of the benefit would be unjust without compensating Plaintiff?
  Yes  **(insert in ink "YES" or "NO" according to your findings)**

**Verdict for Plaintiff against Defendants on Defendants' Breach of Contract Counterclaim**
We the jury, being duly impaneled and sworn, find by a preponderance of the evidence in favor of the Plaintiff and against Defendants American Bridge/McLean

No. 10-3342
*J-Way Leasing, Ltd. v. American Bridge Company, et al.*

Pier 11 Contractors, a Joint Venture on Defendants' Counterclaim for breach of contract.

**Verdict for Plaintiff against Defendants American Bridge/McLean Pier 11 Contractors, A Joint Venture on Plaintiff's Quantum Meruit Claim**
We the jury, being duly impaneled and sworn, find by a preponderance of the evidence in favor of the Plaintiff on its quantum meruit claim and against Defendants American Bridge/McLean Pier 11 Contractors, a Joint Venture and award damages in the amount of $2,921,710.90 (Insert in ink an amount from $0 to whatever the evidence requires.)

The district court read, and all ten jurors individually affirmed aloud, the jury's findings on each interrogatory and verdict. (Page ID # 7860-63) (R.190, Tr. 10/22/09.) The district court asked both parties for their consent before formally discharging the jury:

> **The Court:** Thank you. All right. Each of the jurors have answered in the affirmative that I have read the verdict forms and the interrogatories. They are correct in form and substance so I'll accept each of those. Is there anything further on behalf of the plaintiff?
>
> **Counsel for J-Way:** No, Your Honor. We'll have post judgment issues, but we can address that later. Other than that, we'd like to thank the jurors for their jury service.
>
> **The Court:** Anything further on behalf of the defense?
>
> **Counsel for Appellants:** Judge, we'd also like to thank the jurors for their service. We are going to have some post trial motions.
>
> **The Court:** All right. Folks, that concludes your service. I want to give you thanks of the parties and the Court for the time and effort you have spent . . . . you have returned interrogatories consistent with the evidence and the law. So you are excused from any further services in the case with the thanks of the Court.

(R.190, Tr. 10/22/09.) Defendants subsequently brought motions under Fed. R. Civ. P. 49(b), 50, and 59(a)(1). The district court denied all of these motions. J-Way also brought post-trial motions requesting prejudgment interest on the *quantum meruit* award and seeking to amend the judgment

- 8 -

No. 10-3342
*J-Way Leasing, Ltd. v. American Bridge Company, et al.*

to include American Bridge individually. The district court approved J-Way's request for the interest

but denied their motion to amend the judgment. Finally, Plaintiff sought an award for costs, which

the trial court awarded in the amount of $62,618.63. (*Id.*) Defendants now appeal the district court's

denial of their post-trial motions.

## II.  ANALYSIS

### A.  Standards of Review

On appeal, a district court's interpretation of a verdict rendered pursuant to Fed. R. Civ. P

49 is reviewed for an abuse of discretion.[1] *Radvansky v. City of Olmsted Falls*, 496 F.3d 609, 618

(6th Cir. 2007) (internal citations and quotations omitted). The rule provides:

> (2) *Verdict and Answers Consistent.* When the general verdict and the answers are consistent, the court must approve, for entry under Rule 58, an appropriate judgment on the verdict and answers.
> (3) *Answers Inconsistent with the Verdict.* When the answers are consistent with each other but one or more is inconsistent with the general verdict, the court may:
>> (A) approve, for entry under Rule 58, an appropriate judgment according to the answers, notwithstanding the general verdict;
>> (B) direct the jury to further consider its answers and verdict; or
>> (C) order a new trial.
> (4) *Answers Inconsistent with Each Other and the Verdict.* When the answers are inconsistent with each other and one or more is also inconsistent with the general verdict, judgment must not be entered; instead, the court must direct the jury to further consider its answers and verdict, or must order a new trial.

---

[1] American Bridge cites *Hopkins v. Coen*, 431 F.2d 1055 (6th Cir. 1970) for the proposition that relief is mandatory and not discretionary because the verdicts conflict. (Appellant's Br. 30.) However, as J-Way points out, the alleged conflict here is between the verdict and interrogatory 1, not between multiple verdicts. (Appellee's Br. 24.) Therefore, American Bridge's argument is misplaced.

Fed. R. Civ. P. 49(b).  The district court's determination of whether to admit or exclude expert testimony is reviewed for abuse of discretion as well.  *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528 (6th Cir. 2008).

## B.  The District Court Did Not Abuse Its Discretion

Defendants argue that the district court abused its discretion in entering a judgment because the jury's award of *quantum meruit* damages is untenable given the jury's finding that an oral contract existed between J-Way and American Bridge.  Because Defendants waived this argument, we affirm the district court.

Defendants further argue that it was an abuse of discretion for the district court as gatekeeper not to exclude Jim Thomas's expert testimony as unreliable. This argument is also untenable because it conflates the determination of the reliability of the testimony with its credibility, the weighing of which was properly left to the jury.

### 1. Waiver

Defendants waived their Rule 49(b) argument because any objection to an inconsistency between interrogatories must be made prior to the jury's dismissal. Indeed:

> our court and others sensibly have held that a party must make its Rule 49(b) objection prior to the district court discharging the jury. . . . [I]f, after answers to special interrogatories are read, a party does not object to the discharge of the jury or raise any issue with respect to the jury's responses, that party should be deemed to have waived any objection as to inconsistency, ambiguity, or lack of clarity in the answers.

*Radvansky*, 496 F.3d at 618-19 (quoting *Cent. On Line Data Sys., Inc., v. Filenet Corp*, No.95-1016, 95-1054, 1996 WL 483031, at *11 (6th Cir. Aug. 23, 1996) ); *see also Nolfi v. Ohio Kentucky Oil*

*Corp.*, 675 F.3d 538, 551-52 (6th Cir. 2012) ("Our precedent requires a party to bring a Rule 49(b) motion when there is an inconsistency, which plaintiffs failed to do. A party that fails to do so has waived its right to object."); *Tennessee Consol. Coal Co. v. United Mine Workers of Am.*, 416 F.2d 1192, 1200-01 (6th Cir. 1969). Where a party has waived its right to object under Rule 49(b), the district court should not be held liable for an abuse of discretion on that front. *Nolfi*, 675 F.3d at 552.

Defendants complain that "there was nothing for the jury to reconcile after it read its inconsistent answers to the interrogatories." (Reply Br. 10.) Defendants further assert that asking the jury for clarification may have resulted in "unfind[ing]" the contract. (Reply Br. 11.) This is simply wrong.

Both the Sixth Circuit's waiver rule and the Federal Rules themselves anticipate resubmitting questions to the jury when, as here, the interrogatories are inconsistent with either each other or the verdict. Fed. R. Civ. P. 49(b).[2] Furthermore, the single case American Bridge cites in support of its argument, *Riley v. K Mart Corp.*, 864 F.2d 1049 (3d Cir. 1988), merely supports the ability of the trial court to send inconsistent answers back to the jury for more clarification. *Id*. at 1054. In *Riley*, it was the trial court's acceptance of a second set of answers that were completely different than the

---

[2] American Bridge argues that resubmission to the jury for clarification—which is specifically permitted under the Federal Rules—would have been improper. Instead, it requests a judgment notwithstanding the verdict. When interrogatories conflict with each other (as opposed to merely conflicting with the verdict), as they allegedly do here, the only remedies are resubmission to the jury or a new trial. Fed. R. Civ. P. 49(b)(4). Accordingly, it would have been reversible error for the trial court to have entered a judgment in favor of American Bridge under these circumstances. *Bahamas Agr. Indus. Ltd. v. Riley Stoker Corp.*, 526 F.2d 1174, 1182 (6th Cir. 1975).

first that warranted the reversal. *Id.* Because the jury in this case was never asked to clarify its answers, *Riley* is inapposite.

Accordingly, Defendants' waiver resolves this issue. Under *Nolfi*, the failure to give the trial judge the opportunity to resubmit the questions to the jury for clarification should prevent this panel from finding an abuse of discretion here. *See Nolfi*, 675 F.3d at 552 ("The district court's reading of Rule 49(b) and application of the waiver rule was a correct application of the law and based on the indisputable fact that plaintiffs did not object; therefore, the district court did not abuse its discretion.")

*2. Expert Testimony*

Defendants argue that the only evidence proffered by J-Way to establish the first element of the "total cost" method of calculating damages derived solely from the testimony of J-Way's damages expert, Jim Thomas. They state that this testimony lacked verification and, consequently, should have been excluded as unreliable. Defendants contend it was an abuse of discretion by the district court to have allowed the unreliable testimony to be submitted to the jury.

The district court did not abuse its discretion in allowing Thomas to testify on the elements of the "total cost" method because the question was more one of *credibility* rather than *reliability*, and the weighing of credibility is a task rightly left to the jury. The district court correctly submitted Thomas's testimony to the jury to determine if J-Way had established the elements of the "total cost" method by a preponderance of the evidence, as was dictated in the jury instructions.

For the foregoing reasons, we **AFFIRM** the district court.